UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| THERESA DICKINSON, | : | |
| Plaintiff | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 3:04cv312(JCH) |
| MERRILL LYNCH, PIERCE, FENNER, | : | |
| & SMITH INC., | : | |
| Defendant. | : | MAY 5, 2006 |

**RULING ON MOTION FOR SUMMARY JUDGMENT [Doc. No. 27] AND MOTION TO STRIKE EXHIBIT [Doc. No. 42]**

**I.     INTRODUCTION**

The plaintiff, Theresa Dickinson ("Dickinson"), is a former employee of the defendant, Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch").  Dickinson brings the following claims against Merrill Lynch:  sex discrimination in employment, in violation of Title VII of the United States Code, 42 U.S.C. § 2000e et. seq., (Count I) and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn.Gen. Stat. § 46a-60 (Count II); negligent infliction of emotional distress (Count III); negligent investigation (Count IV); defamation (Count V); breach of contract (Count VI); and breach of the covenant of good faith and fair dealing (Count VII).  Merrill Lynch moves for summary judgment on all of these claims.  Also pending is a motion by Dickinson to strike an exhibit that Merrill Lynch appended to its reply memorandum in support of summary judgment.

**II.     STANDARD OF REVIEW**

In a motion for summary judgment, the burden lies on the moving party to

1

establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); SCS Communications, Inc. v. Herrick Co., 360 F.3d 329, 338 (2d Cir. 2004).  The moving party may satisfy this burden "by showing – that is pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002) (per curiam) (internal quotation marks and citations omitted); accord Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995).

A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact . . . ." Miner v. City of Glens Falls, 999 F.2d 655, 661 (2d Cir. 1993) (internal quotation marks and citation omitted).  A dispute regarding a material fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson, 477 U.S. at 248), cert. denied, 506 U.S. 965 (1992).  After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." Aldrich, 963 F.2d at 523 (internal citation omitted).  Thus, "'[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper.'" Id. (quoting

2

Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991), cert. denied, 502 U.S. 849 (1991)); see also Suburban Propane v. Proctor Gas, Inc., 953 F.2d 780, 788 (2d Cir. 1992) ("Viewing the evidence in the light most favorable to the nonmovant, if a rational trier could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is inappropriate."). "'If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.'" Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82-83 (2d Cir. 2004) (quoting Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996)).

When a motion for summary judgment is supported by sworn affidavits or other documentary evidence permitted by Rule 56, the nonmoving party "may not rest upon the mere allegations or denials of the [nonmoving] party's pleading." Fed. R. Civ. P. 56(e); Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). Rather, "the [nonmoving] party's response, by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial" in order to avoid summary judgment. Id. "The non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir.1990) (internal quotations and citations omitted). Similarly, a party may not rely on conclusory statements or an argument that the affidavits in support of the motion for summary judgment are not credible. Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993).

III.    FACTS[1]

Merrill Lynch hired Dickinson as a Financial Advisor ("FA") in November 2000. At the time of her hire, she signed a contract. Paragraph seven of the contract read, "NOTHING HEREIN IS A PROMISE OF EMPLOYMENT FOR A FIXED TERM. MERRILL LYNCH MAY TERMINATE MY EMPLOYMENT FOR ANY REASON OR FOR NO REASON, JUST AS I MAY RESIGN AT ANY TIME." Def.'s Mem. Supp. Mot. Summ. J., Ex. 1 [Doc. No. 27-6] (emphasis in original). The same contract also contained some provisions that would come into effect if and only if Dickinson was to resign or be terminated for cause.

For most of her employment with Merrill Lynch, Dickinson worked in the company's Middletown, Connecticut branch office. She began work in Merrill Lynch's two-year salaried training program. That office was supervised by Joseph Stango, who held the title of Financial Advisor in Charge ("FAIC"). Lise Grondin, a Client Associate ("CA") in the Middletown office, was assigned to assist both Stango and Dickinson, although she primarily worked with Stango.

Stango's office was next to Dickinson's. During the time they worked together in Middletown, Stango would bang on the wall between the two offices when he wanted to get Dickinson's attention. Dickinson Dep. at 89-90, Plf.'s L.R.Civ.P. 56(a)2 Statement Appx. [hereinafter "Plf.'s R. 56(a)2 Appx."] [Doc. No. 35-1]; see also Stango Dep. at 82, Plf.'s R.56(a)2 Appx. [Doc. No. 34-5]. He frequently invited Dickinson to go out for food

_____

[1]This section sets forth material facts from the parties' local Rule 56(a) statements and accompanying exhibits. In this section, the court resolves all disputed facts and draws all inferences the evidence reasonably can support in favor of the plaintiff, as the nonmoving party.

or drinks after work and would rub her back.  Id. at 90.  She told him not to touch her.
Id.

In August 2002, Dickinson went to see Fran Adams, Managing Director for Merrill Lynch's New Haven Complex, to whom she complained about Stango's behavior toward her and that Stango was treating her as an assistant.  Adams responded that Dickinson, as a participant in the two-year training program, had to deal with Stango's behavior.  Dickinson Dep. at 184, Plf.'s R. 56(a)2  Appx. [Doc. No 35-3[2]].  Stango recalls that Adams spoke to him about a complaint by Dickinson.  Stango Dep. at 83, Plf.'s R. 56(a)2 Appx. [Doc. No. 34-5].

Pat Lyman, a female employee with twenty-seven years of experience in the industry, asked to mentor Dickinson, but Stango refused to permit this arrangement.  Dickinson Dep. at 54, 58, Plf.'s R. 56(a)2  Appx. [Doc. No 35-3].  He told Dickinson that he wanted her to work with a male and assigned her to work with a male who had just finished the training program and who was too busy to provide Dickinson with the assistance she requested.  Id. at 56, 58.

Dickinson was the first person in the Middletown office to report to work and would sometimes work late in the evenings.  Id. at 63, 78-79.  Stango would come in later and was frequently out of the office.  Id. at 89.  Stango also sometimes took credit for Dickinson's presentations.  Id. at 79.

The largest and most significant account that Dickinson serviced during her time at Merrill Lynch was that of Save the Children Federation ("STC").  STC did not

---

[2]The Dickinson deposition excerpt attached to the plaintiff's Local Rule 56(a)2 statement is split into three documents:  35-1, 35-2, and 35-3.

frequently withdraw funds from its account.  Id. at 112 (recalling being made aware of two withdrawals).  Following September 11, 2001, when STC did transfer money out of its account, it did so by wire transfer.  Id. at 111-12.  The institutional side of Merrill Lynch handled these fund transfers, and Dickinson became aware of them only after the fact.  Id.  Stango repeatedly asked Dickinson to share the job of servicing the STC account with him, but she did not do so.  See id. at 95.

Merrill Lynch's Middletown office closed in 2002, and Dickinson was transferred to the company's Madison, Connecticut office.  The Madison office was entirely staffed by males until Dickinson's transfer.   In a preliminary interview, Elliot Popper, the male manager of the Madison office, asked Dickinson if she had any children and commented that he could not look her in the face because she "had the bluest eyes he'd ever seen."  Id. at 98-100.  Plaintiff was assigned to an office space that had previously been used as a storage space, which she had to clean out before she could use.  Upon her first full day of work in Madison, December 3, 2002, Dickinson's computer would not connect to the company network, and she had no access to email or her clients' accounts.  Id. at 106-07.

On the same day, December 3, Grondin told Dickinson by phone that Grondin had spoken with STC and that "they were going to transfer some money" out of their Merrill Lynch account.  Dickinson Dep. at 111, Plf.'s R. 56(a)2 Appx. [Doc. No. 35-2].  Dickinson replied by saying, "that's done on the institutional side, there's nothing we have to do."  Id.  Dickinson also told Grondin that Dickinson would not be able to see the transfer on her computer and that Grondin should let Dickinson know when she saw the transfer, because Dickinson's computer network connection was not working, and

6

she had been told that it would not be fixed that day.  Id.  Grondin called Merrill Lynch's Institutional Funds division and ordered liquidation of $225,000.00 from the STC account.  Grondin Written Statement to Corporate Counsel, Def.'s Mem. Supp. Mot. Summ. J., Ex. 2 [Doc. No. 27-5]; Plf.s' R.56(a)2  Appx., Ex. 9 [Doc. No. 34-7]. Grondin has averred, in a statement written on or after December 12, 2002, that she received a call on December 3 from a woman who identified herself as Pat Long from STC and said she wanted do make a wire transfer of $225,000.00 but "did not know what she needed to do."  Def.'s Mem. Supp. Mot. Summ. J., Ex. 2 [Doc. No. 27]. Patricia Long is STC's Vice President for Finance/Administration and Treasurer, but she was not included on the list of STC representatives authorized to approve wire transfers.  See EMA Account Authorization for Nonprofit Organizations, Plf.'s R.56(a)2 Appx., Ex. 3 [Doc. No. 35-8].

The next morning, still without computer network access, Dickinson called Grondin from Madison to see if there was anything in the STC account.  Dickinson Dep. at 113, Plf.'s R. 56(a)2 Appx. [Doc. No. 35-2].  Dickinson told Grondin she would be in Middletown, where Dickinson had a regularly scheduled appointment.  Id.  On her way, she picked up her son, who was ill, from school.  Id.

Also on December 4,[3] a forged LOA was received by the Middletown office.  The first version was unsigned.  Stango later answered a call from a person purporting to be

_____

[3]Although the date stamp on the document read "2002 NOV 34 AM 11:20," this occurred because the stamp had not been reset at the end of November, and corresponds to an actual receipt date of December 4, four days after the end of November.  Stango Dep. at 71, Plf.'s R. 56(a)2  Appx. [Doc. No. 34-5].  Neither party disputes that the time on the stamp was correct.

Pat Long and told her that the LOA required a signature.  Email from Stango to Felicia Klug of Dec. 16, 2002, Plf.'s R.56(a)2  Appx., Ex. 26 [Doc. No. 35-10].  Another copy of the forged LOA, with a signature, was thereafter faxed to the Middletown office.  This LOA was not on official STC letterhead and did not display the STC logo.  Compare Forged LOA, Def.'s Mem. Supp. Mot. Summ. J., Ex. 3 [Doc. No. 27-5] with Letter from Michael McMahon to Felicia Klug of Dec. 13, 2002, Plf.'s R. 56(a)2  Appx., Ex. 14 [Doc. No. 35-7].  It directed that Merrill Lynch transfer funds to a bank in California, in an account held by "The Tulving Co."  Forged LOA at D00042 [Doc. No. 27-5].  Stango approved the signed LOA by initialing it.  See Stango Dep. [Doc. No. 34-5] at 65-66.  At this time, the STC account file was no longer in the Middletown office, because Dickinson had brought it to Madison.  See Plf.'s Dep. at 130.

The timestamp that was placed on the signed LOA after its receipt by Merrill Lynch read 11:20, but the actual wire transfer ("ASAP transmittal") occurred two minutes earlier, at 11:18 a.m.  See Faxed Copy of ASAP Fed Fund Entry, Plf.'s R. 56(a)2 Appx., Ex. 23 [Doc. No. 35-9].  Merrill Lynch's records show that an "LOA signed by Patricia Long Treas/Financ[e]" was "entered by Lise Grondin" and  "Approved by Patricia Apuzzo," all on December 4, 2002.  ASAP Message History, Plf.'s R. 56(a)2 Appx., Ex. 10 [Doc. No. 35-7]; see also ASAP Routing History, Plf.'s R. 56(a)2 Appx., Ex. 11 [Doc. No. 35-7] (showing that Grondin entered the ASAP at 11:19 am).  Apuzzo was the Merrill Lynch Document Controller for New Haven, whom Merrill Lynch policy required to ensure that any LOA "was signed by the account holder(s) or authorized person(s)."  Letter from Adams to Apuzzo of Mar. 24, 2003, Plf.'s R. 56(a)2  Appx., Ex. 16 [Doc. No. 35-9].

8

A short time after the wire transfer, on December 4, Grondin left a voicemail message on Dickinson's cell phone, instructing her to call Grondin.  See Dickinson Aff. ¶ 7, Plf.'s R. 56(a)2  Appx. [Doc. No. 4].  Dickinson, whose phone had been turned off, received the message at about 12:25 pm.  Id.  She called the Middletown office at 12:27 pm, and both Grondin and Stango picked up the phone on different extensions. Id.; Nextel Cell Phone Bill, item 78, Plf.'s R. 56(a)2 Appx., Ex. 21 [Doc. No. 35-9].  This conversation lasted no more than two minutes, Nextel Cell Phone Bill, item 78 [Doc. No. 35-9].  Grondin instructed Dickinson to call Tracy Lyons, in Merrill Lynch's New Haven office, and Stango gave her the number.  Dickinson Aff. ¶ 7.  Neither said that an LOA had been received and approved.  Id. at ¶ 8.  Dickinson's subsequent call to New Haven on December 4 did not involve a discussion of the LOA.   See Dickinson Dep. at 115, Plf.'s R. 56(a)2  Appx. [Doc. No. 35-2].

On December 12, Dickinson found a note on her desk that said that Rosemary Smith, the President of STC, had called regarding a wire transfer.  See id. at 126. Dickinson returned the phone call, and Smith informed her that someone had taken $225,000 out of the STC account on December 4.  Id.  Dickinson recounted her conversation with Grondin on December 3, telling Smith that Grondin had said she spoke to "Pat or somebody up there," who had said STC was going to withdraw funds. Id.  Smith informed Dickinson that the transfer had gone to California, and Dickinson said she would look into the matter.  Id. at 127.

Dickinson then called Grondin, who said that she had put the LOA in an envelope with some mail she had sent down to Dickinson.  Id. at 127.  Dickinson had left the envelope at home and had not looked at the papers in it.  She immediately went

9

home and looked at the forged, signed LOA[4] for the first time.  She then called Elliot

Popper to discuss the situation.  He told her to return to Madison and call Felicia Klug,

Merrill Lynch's Compliance Officer.

Klug instructed Dickinson to send her a copy of the faxed LOA, which Dickinson

did with the help of another staff member.  Id. at 128.  Dickinson then called Lise, and

then Stango, to discuss how they had handled the wire transfer request.  Dickinson

Dep. at 129, Def.'s Mem. Supp. Mot. Summ. J. Appx. [Doc. No. 27-12]; Dickinson Dep.

at 130, Plf.'s R. 56(a)2  Appx. [Doc. No. 35-2].  Klug called Dickinson after she received

the faxed LOA, and began asking her questions and screaming at her.  Dickinson Dep.

at 130-31, Plf.'s R. 56(a)2  Appx. [Doc. No. 35-2].  Concerned after her encounter with

Klug, Dickinson secured a lawyer, who called the New Haven office to say he

represented her.  Id.

By Klug's account, she next explained the situation to Apuzzo and Associate

Administrative Manager Ron Brandes, and then called the bank and trust company that

had been involved in the wire transfer, as well as Smith and Grondin.  Klug, still in New

Haven, next asked Popper to call Dickinson into his office in Middletown.  See

Memorandum from Klug to Kelly and Michael Putetti of Jan. 2, 2003 [hereinafter "Klug

Mem."], Def.'s Mem. Supp. Mot. Summ. J., Ex. 4 [Doc. No. 27-5].  With the plaintiff on

speaker phone and Apuzzo and Ron Brandes, Associate Administrative Manager, in

her office, Klug told Dickinson she had no right to call an attorney, that Dickinson alone

was responsible for the missing $225,000, and that Dickinson  "would not be pleased

---

[4]The unsigned LOA had been shredded.

with the outcome of the investigation."  Dickinson Dep. at 132, Plf.'s R. 56(a)2  Appx.
[Doc. No. 35-2]; see also Klug Mem.  Dickinson begged Klug to review her phone
records,  but Klug refused.  Dickinson Dep. at 132, Plf.'s R. 56(a)2  Appx. [Doc. No. 35-
2].  Dickinson was so upset about Klug's interrogation of her that she cried after leaving
Popper's office.  Dickinson Dep. at 167-68, Def.'s Mem. Supp. Summ. J. Appx. [Doc.
No. 27-12].

        Dickinson reported to work the next day.  At 3:00 pm in the afternoon, Klug
instructed her to go home and not to have contact with any Merrill Lynch clients or
employees until December 17, when Dickinson was told to come to New Haven to meet
with Merrill Lynch's lawyers.  Dickinson Dep. at 132-33, Plf.'s R. 56(a)2 Appx. [Doc. No.
35-2].  Klug also told Dickinson that Dickinson could not have access to the STC
account and that the question of who would monitor the account was "[n]ot my
problem."  Id. at 133.

        Maura Kelly, then an attorney for Merrill Lynch's office of Compliance Counsel,
took a leading role in the internal investigation of how the fraudulent LOA was handled.
On December 13, Klug gave Kelly her version of the events surrounding the LOA.  Klug
informed Kelly that Dickinson was "never at work" and had a "bad attitude," and that she
had given conflicting versions of the events surrounding the LOA.  See Kelly Dep. at 51,
Plf.'s R. 56(a)2 Appx. [Doc. No. 34-2].

        On December 17, 2006, Dickinson was  interviewed by Kelly and by Security
Coordinator Thomas J. Redmond of Merrill Lynch's Corporate Security office.  Kelly
Dep. at 18-20, Def.'s Mem. Supp. Mot. Summ. J. [Doc. No. 27-14].  Dickinson stated
that she spoke with Grondin on December 3 about the STC wire transfer.  She also

admitted that she spoke with Grondin on December 4, but stated that Grondin had not said anything on December 4 about STC, receipt of the LOA, or the phone call from "Pat Long." Id. at 58, 61.

Kelly also met with Grondin and Stango. Id. at 20, 28. Grondin's version of events, in particular, conflicted with Dickinson's in that Grodin maintained that she spoke to Dickinson shortly after receiving the forged LOA, before the LOA was approved by Stango, and received instruction from Dickinson as to how to proceed. See id. at 30-31.

On the recommendation of Kelly and her supervisor, Adams terminated the plaintiff on January 10, 2003. He informed her that she "had failed to service the account" and that it was her "responsibility . . . to see  that that an LOA like this didn't go through, and that [she] hadn't cooperated with the investigation," and that she "was being terminated for lack of follow through." Dickinson Dep. at 169, Plf.'s R. 56(a)2 Appx.

Merrill Lynch filed a Form U-5 Uniform Termination Notice for Securities Industry Registration with the NASD. Merrill Lynch's official reasons for discharging Dickinson, as stated on this form, were that, "she provided management with conflicting information during the course of an internal review" and "the firm determined that she failed to adequately service a client's account." Form U-5 Uniform Termination Notice for Securities Industry Registration, Def.'s Mem. Supp. Mot. Summ. J., Ex. 8 [Doc. No. 27-5].

Stango was not disciplined, even though he had signed off on the transfer without checking the signature against the one on file, and even though he had

12

previously been the subject of a customer complaint, whereas Dickinson had not.

Grondin and Apuzzo received "Letters of Education," Merrill Lynch's least severe form

of discipline, for their roles in the wire transfer.  <u>See</u> Adams Dep. at 37-38, 46-47, Plf.'s

R. 56(a)2  Appx. [Doc. No. 34-6].

## IV.   DISCUSSION

### A.   Motion to Strike Exhibit

As a preliminary matter the court grants the plaintiff's motion to strike the exhibit

attached to the affidavit of Felicia Klug, which was submitted for the first time with

Merrill Lynch's reply memorandum in support of summary judgment.  This Merrill Lynch

document, which contains data on Dickinson's performance at Merrill Lynch, was not

produced during discovery, despite the plaintiff's production request for  "all documents

upon which you rely in asserting as a defense that Defendant had legitimate, non-

discriminatory business reasons that formed the basis for Defendant's decision to

terminate Plaintiff's employment."  Plf.'s First Request for Production & Disclosure at

15, Plf.'s Mem. Supp. Mot. Strike Appx. [Doc. No. 42].   Merrill Lynch argues that it did

not rely on this document to establish a legitimate business reason for the termination,

but submitted it only in response to the plaintiff's assertion that no one at Merrill Lynch

ever informed her that her production level was considered low.  Dickinson Aff. at ¶ 3,

Plf.'s R. 56(a)2  Appx. [Doc. No. 35-4].  However, Merrill Lynch claimed in its original

memorandum in support of summary judgment that the plaintiff's production level was

considered low.  Def.'s Mem. Supp. Mot. Summ. J. at 6 [Doc. No. 27-1].  Even though

the defendant mentioned this factual allegation only in the introductory facts section of

that memorandum, the fact had no relevance to the case other than to lend credence to

the more specific business reasons Merrill Lynch proffered for the termination.  The court finds no legitimate excuse for the delayed production of this document and will not consider it as evidence in this ruling.

**B.    Discrimination Claims (Counts I and II)**

The plaintiff's Title VII and CFEPA discrimination claims are both analyzed under the burden-shifting analysis first announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).[5]  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 146-149 (2000); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-511 (1993); Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253-256 (1981); Brittell v. Dep't of Correction, 247 Conn. 148, 164 (1998) (holding that law interpreting Title VII guides interpretation of CFEPA).   The initial burden lies on the plaintiff.  To establish a prima facie case of discriminatory termination on the basis of sex, "a plaintiff must show (1) that [s]he was within the protected [ ] group, (2) that [s]he was qualified for the position, (3) that [s]he was discharged, and (4) that the discharge occurred under circumstances giving rise to an inference of [sex] discrimination."  Schnabel v. Abramson, 232 F.3d 83, 87 (2d Cir. 2000) (internal quotation marks and citation omitted); see also McDonnell Douglas, 411 U.S. at 802 (stating the prima facie case more generally).  Once a plaintiff has established a prima facie case, a rebuttable presumption of discrimination arises, and the burden shifts to the defendant to offer a legitimate, non-discriminatory reason

---

[5]The Second Circuit continues to apply the McDonald Douglas-Burdine-Hicks burden-shifting analysis to Title VII claims at the summary judgment stage, see, e.g., Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005); Feingold v. New York, 366 F.3d 138 (2d Cir. 2004), even though some other courts have declined to apply it following the Supreme Court's decision in Desert Palace, Inc. v. Koster, 539 U.S. 90 (2003).  E.g., Dare v. Wal-Mart Stores, Inc., 267 F.Supp.2d 987(D.Minn.2003).

for its actions.  See Burdine, 450 U.S. at 254.  Upon the articulation of such a non-discriminatory reason for the employment action, the presumption of discrimination that arose with the establishment of the prima facie case drops out, see St. Mary's Honor Ctr., 509 U.S.  at 510-11, and the burden shifts back to the plaintiff to fulfill his ultimate burden of proving that the defendant intentionally discriminated against him in the employment action.  Reeves, 530 U.S. at 143.  In order to satisfy this burden, the plaintiff may attempt to prove that the legitimate, non-discriminatory reason offered by the defendant was not the employer's true reason, but was a pretext for discrimination. Id.

A prima facie case combined with a showing that an employer's asserted justification is false is sometimes, but not always, sufficient to permit a discrimination claim to survive summary judgment.  Schnabel, 232 F.3d at 89-91 (citing Reeves, 530 U.S.).  The court must "examin[e] the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" Schnabel, 232 F.3d at 90 (quoting Reeves, 530 U.S. at 143).   The plaintiff need not show that age or race was the only factor motivating any adverse employment actions he suffered in order to make a showing of employment discrimination.   See 42 U.S.C. §2000e-2(m); Desert Palace, Inc. v. Koster, 539 U.S. 90 (2003).  "The 'ultimate issue' in an employment discrimination case is whether the plaintiff has met her burden of proving that the adverse employment decision was motivated at least in part by an 'impermissible reason,' i.e., a discriminatory reason," regardless of whether the case is presented as

15

one of single or dual motive.  <u>Stratton v. Dep't for the Aging for New York</u>, 132 F.3d

869, 878 (2d Cir. 1997).

     With respect to the prima facie case, the only element that the defendant

contests is the fourth:  that the discharge occurred in circumstances giving rise to an

inference of discrimination on the basis of sex.  <u>See</u> Def.'s Mem. Supp. Mot. Summ. J.

[Doc. No. 27] at 17-18.  Where an employer's intent is at issue, the court must be

cautious about granting summary judgment, as circumstantial evidence may sometimes

give rise to a genuine issue of material fact.  <u>See</u> <u>Kerzer v. Kingly Mfrg.</u>, 156 F.3d 396

(2d Cir. 1998); <u>McLee v. Chrysler Corp.</u>, 109 F.3d 130 (2d Cir. 1997).

     Evidence that one or more employees who were similarly situated to the plaintiff

in all respects other than membership in a protected group received more favorable

treatment than the plaintiff "is a recognized method of raising an inference of

discrimination for purposes of making out a prima facie case."  <u>Mandell v. Cty. of</u>

<u>Suffolk</u>, 316 F.3d 368, 379 (2d Cir. 2003) (internal citation omitted); <u>see</u> <u>McGuinness v.</u>

<u>Lincoln Hall</u>, 263 F.3d 49, 54-55 (2d Cir. 2001) (holding that a showing that one

similarly situated employee outside the plaintiff's protected group was treated more

favorably than the plaintiff was sufficient to make out fourth element of a prima facie

case); <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 42 (2d Cir. 2000) ("That Elmendorf, a

white employee, then received a second last chance waiver upon his second violation

of the Policy, while Graham, a black employee, did not, raises an inference that

Graham's dismissal for the second violation was a result of race discrimination.").

     To be "similarly situated," an individuals with whom the plaintiff attempts to

compare herself need not be similarly situated "in all respects," but must be "similarly

16

situated in all material respects." <u>McGuinness</u>, 263 F.3d at 53-54 (2d Cir. 2001) ("The

magistrate judge interpreted <u>Shumway</u> to mean that another employee cannot be

similarly situated to a plaintiff unless the other employee had the same supervisor,

worked under the same standards, and engaged in the same conduct. This was a

misreading of <u>Shumway</u>.") (citing <u>Shumway v. United Parcel Serv., Inc.</u>, 118 F.3d 60,

64 (2d Cir. 1997)); <u>Graham</u>, 230 F.3d at 39 (citing <u>Shumway</u>, 118 F.3d at 63).  "In other

words, where a plaintiff seeks to establish the minimal prima facie case by making

reference to the disparate treatment of other employees, those employees must have a

situation sufficiently similar to plaintiff's to support at least a minimal inference that the

difference of treatment may be attributable to discrimination." <u>McGuinness</u>, 263 F.3d at

54.

> What constitutes "all material respects" [ ] varies somewhat from case to
> case and . . . must be judged based on (1) whether the plaintiff and those
> he maintains were similarly situated were subject to the same workplace
> standards and (2) whether the conduct for which the employer imposed
> discipline was of comparable seriousness. . . . In other words, there
> should be an objectively identifiable basis for comparability.  Hence, the
> standard for comparing conduct requires a reasonably close resemblance
> of the facts and circumstances of plaintiff's and comparator's cases, rather
> than a showing that both cases are identical. . . . The determination that
> two acts are of comparable seriousness requires -- in addition to an
> examination of the acts -- an examination of the context and surrounding
> circumstances in which those acts are evaluated.

<u>Id.</u> at 40 (internal citations and quotation marks omitted).  "Ordinarily, the question

whether two employees are similarly situated is a question of fact for the jury."  <u>Graham</u>,

230 F.3d at 39.

The instant case is no exception.  The evidence presents at least a genuine

question of fact as to whether Stango and Dickinson were similarly situated.  Although

Stango had seniority over Dickinson, both individuals were "subject to the same workplace standards." Indeed, as Dickinson argues and Merrill Lynch does not dispute, both were Financial Advisors, subject to the same SEC, NASD, and Merrill Lynch rules, including the Merrill Lynch rules for processing LOAs. See Funds Processing Letter of Authorization (LOA) Guidelines and Requirements, Plf.'s R. 56(a)2 Appx., Ex. 13 [Doc. No. 35-7].

Similarly, there is a genuine question of fact as to whether the conduct for which Merrill Lynch terminated Dickinson was of comparable seriousness to the conduct in which Stango engaged – and even whether Stango engaged in more serious conduct than the conduct for which Dickinson was fired.   Fran Adams, who told Dickinson she was fired, explained that the reasons for her termination were that she "had failed to service the account" and that it was her "responsibility . . . to see  that an LOA like this didn't go through, and that [she] hadn't cooperated with the investigation," and that she "was being terminated for lack of follow through."  Dickinson Dep. at 169, Plf.'s R. 56(a)2  Appx.  The STC account was assigned to Dickinson, and not Stango, but only Stango signed off on the fraudulent wire transfer in his capacity as Financial Officer in Charge of the Middletown office, after Dickinson had left the office.  Stango approved the transfer without verifying the authenticity of the signature, and without checking whether Patricia Long was authorized to withdraw funds from the account. Moreover, he did so despite several circumstances that may have warranted particular caution, and of which Kelly received evidence:  Grondin had commented to Stango that the December 3 phone call from the person claiming to be Pat Long was weird, and also asked Stango after his December 4 phone conversation with "Pat Long" if this call

18

seemed weird, see Grondin Written Statement to Corporate Counsel, Def.'s Mem. Supp. Mot. Summ. J., Ex. 2 [Doc. No. 27-5]; the first LOA that arrived on December 4 was unsigned, not on regular STC letterhead, and lacked the STC logo; and the wire transfer request directed Merrill Lynch to transfer funds to a California bank account held by a company whose name bore no resemblance to STC.  The conflicting accounts of the conversations between Dickinson and Grondin on December 3 and 4 create a genuine issue of fact as to whether Stango even alerted, or asked Grondin to alert, Dickinson on December 4 that an LOA had come in.  If Stango did not, he would appear to have at least as much responsibility for approving the fund transfer than Dickinson, who did not know that an LOA had been received, let alone that Stango had decided to approve the LOA without first verifying that it was signed by an authorized agent of STC.  Therefore, there is a genuine question of material fact as to whether Stango and Grondin were similarly situated.  Because Stango was not disciplined at all, whereas Dickinson was terminated, she has made a prima facie showing that her termination was motivated by sex discrimination.

The court notes that the fact that the investigation and recommendation to discharge Dickinson were made by females does not prevent Dickinson from presenting evidence of sex discrimination.  The Supreme Court has cautioned that, "[b]ecause of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of that group."  Oncale v. Sundowner, 523 U.S. 75, 78 (1998) (internal quotation omitted).

Merrill Lynch, in turn, has presented a legitimate business reason for its decision

to terminate Dickinson.  Its official reasons for the termination were that she had provided Merrill Lynch with conflicting information about the transfer and that she had failed to adequately service a client's account.  See Form U-5 Uniform Termination Notice for Securities Industry Registration, Def.'s Mem. Supp. Mot. Summ. J., Ex. 8 [Doc. No. 27-5].  "Any legitimate, non-discriminatory reason will rebut the presumption triggered by the prima facie case. Thus, '[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons' in order to nullify the presumption and obligate the plaintiff to satisfy the burden of proof."  Fisher v. Vassar College, 114 F.3d 1332, 1335 (2d Cir. 1997), cert. denied, 522 U.S. 1075 (1998), reh'g denied, 523 U.S. 1041 (1998) (quoting Burdine, 450 U.S. at 254).  Although the objective correctness of this determination is in dispute, Merrill Lynch has proffered a legitimate, non-discriminatory business reason for the termination.

Next, the court considers whether Dickinson has shown that Merrill Lynch's proffered reasons for the termination were pretextual.  In this regard, as the plaintiff conceded at oral argument, the fact that an employer investigates an incidence of alleged employee misconduct and, in good faith, arrives at an objectively incorrect result does not show that the employer's stated reasons were a pretext for unlawful discrimination.  See, e.g., Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1063 (9th Cir. 2002); Euerle-Wehle v. United Parcel Svc., 181 F.3d 898, 900 (8th Cir. 1999); Rorie v. UPS, 151 F.3d 757, 761 (8th Cir. 1998).  The plaintiff must present evidence that the proffered reasons were not the defendant's true reasons for deciding to fire her.  See Reeves, 530 U.S. at 143.

In this case, the plaintiff has presented sufficient evidence to create a genuine

20

issue of fact as to whether Merrill Lynch's proffered reasons were pretextual.  She has presented evidence that could reasonably support an inference that the investigation that Merrill Lynch undertook following the wire transfer was biased against her and that the individual attorneys upon whose recommendations Adams based his decision to discharge her may not have recommended discharge for the reasons that Merrill Lynch has articulated.  For example, if a jury credits Dickinson's testimony that Klug, from the very first day of the investigation, refused to listen to her explanations, screamed at her, and informed her that Dickinson "would not be pleased with the outcome of the investigation,"  Dickinson Dep. at 131-32, Plf.'s R. 56(a)2 Appx. [Doc. No. 35-2], it could reasonably infer that Klug did not conduct her portion of the investigation in good faith, and that she knew that the information she gave Kelly about Dickinson was not accurate.  Similarly, the court finds a question of fact as to whether Klug's characterizations of Dickinson as "never at work" and having "a bad attitude," Kelly Dep. at 51, Plf.'s R. 56(a)2 App. [Doc. No. 34-2], could have been made in good faith in light of the record of Klug's investigation.

Although Attorney Kelly, rather than Klug, made the final recommendation to fire Dickinson, Kelly's conclusions that Dickinson was being untruthful and had failed adequately to service a client's account relied heavily upon Klug's statements to Kelly. See, e.g., Kelly Dep. at 15, 22-23, Plf.'s R. 56(a)2 Appx. [Doc. No. 34-2].  Klug was acting as an agent of Merrill Lynch in conducting the investigation, just as Kelly was. See Kelly Dep. at 22-23, Def.'s Mem. Supp. Summ. J. [Doc. No. 27-14]; see also Reardon v. Mutual Life Ins. Co. of N. Y., 138 Conn. 510, 516 (1952) ("When an agent acting within the scope of his authority obtains knowledge of a fact relevant to the

transaction in which he is engaged, ordinarily that knowledge is imputed to his principal. The knowledge of the agent is the knowledge of his principal"). Thus, even if Kelly were found to have conducted her part of the investigation in good faith, the reasons that Merrill Lynch proffers for the termination may have been reasons that Klug originally created as a pretext for a different motivation.

Additionally, the record contains evidence from which a factfinder could infer that the Merrill Lynch Compliance attorneys conducting the investigation knew that Grodin's account of the conversations she had with Dickinson on December 4, as told to Klug, was inaccurate. Grondin told Klug that Grondin called Dickinson's cell phone from the Middletown office on December 4 to tell her that Grondin and Stango had received a faxed LOA and to discuss whether Pat Long was permitted to authorize the transfer and how Grondin should proceed. See Grondin Written Statement, Def.'s Mem. Supp. Mot. Summ. J., Ex. 2 [Doc. No. 27-5]. In contrast, in Dickinson's version of the events of December 4, which the court credits for purposes of the summary judgement motion, Dickinson received no calls on her cell phone from the Middletown office on December 4, and Grondin "never told [her] on December 4, 2002, about the receipt of the LOA." Dickinson Aff. ¶¶ 6-8. Phone records for December 4, which the evidence shows were available to Merrill Lynch during the investigation, lend support to Dickinson's version of events. Dickinson's cell phone records for December 4 show only one unidentified incoming call, which lasted for one minute or less, and one outgoing call at the time Dickinson has said she called the Middletown office. See Plf.'s R. 56(a)2 Appx., Ex. 21 at P022, line 75, 78. Even more significantly, Merrill Lynch's phone records show no outgoing calls on December 4 to either of the two cell phone numbers that Grondin

22

noted on her Written Statement to Corporate Counsel as belonging to Dickinson.  See Plf.'s R. 56(a)2  Appx., Ex. 17, D00745-46 [Doc. No. 35-9]; Grondin Written Statement, Def.'s Mem. Supp. Mot. Summ. J., Ex. 2 [Doc. No. 27-5].

This evidence of pretext, combined with the evidence that Stango received preferential treatment even though he actually approved the fraudulent LOA without verifying its signature, and that Merrill Lynch knew that Stango, not Dickinson, had signed off on the LOA, is sufficient to create a genuine issue of fact as to the ultimate issue in Counts I and II:  whether the plaintiff's termination was motivated by discrimination on the basis of sex.  The court therefore denies the defendant's motion for summary judgment on Counts I and II.

### C.     Retaliatory Discharge

In her memorandum in opposition to summary judgment, Dickinson argues for the first time that Merrill Lynch terminated her in retaliation for Dickinson's August 2002 complaint to Adams about Stango's behavior.  Dickinson did not assert this claim in her Complaint before this court, nor in her EEOC complaint.  See Notice of Removal [Doc. No. 1]; EEOC Complaint, Def.'s Reply Mem. Supp. Summ. J., Ex. 1.  Moreover, neither of these complaints allege that Dickinson ever complained to Adams about Stango's behavior.  See id.  Moreover, she cannot now amend her complaint to include this claim because her retaliation claim would be untimely.  See 42 U.S.C. §2000e-5(e)(1) (requiring EEOC complaints to be filed within 180 days "after the alleged unlawful employment practice occurred"); see also Butts v. City of New York Dept. of Housing Preservation and Development, 990 F.2d 1397, 1401 (2d Cir. 1993), superseded by

statute on other grounds as stated in Hawkins v. 1115 Legal Svc. Care, 163 F.3d 684 (1998) ("A district court only has jurisdiction to hear Title VII claims that either are included in an EEOC charge or are based on conduct subsequent to the EEOC charge which is 'reasonably related' to that alleged in the EEOC charge.") (internal citations omitted).  The court does not address the merits of the implied retaliation claim.

### D. Negligent Infliction of Emotional Distress (Count III)

In the employment context, liability for negligent infliction of emotional distress can arise only from conduct occurring in the "termination of employment," and not from conduct that is "part of an ongoing employment relationship." Perodeau v. City of Hartford, 259 Conn. 729, 762-63 (2002). Moreover, "a finding of a wrongful termination is neither a necessary nor a sufficient predicate for a claim of negligent infliction of emotional distress." Id. at 751.  Liability for negligent infliction of emotional distress in the employment context requires that "the defendant's conduct during the termination process was sufficiently wrongful that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that [that] distress, if it were caused, might result in illness or bodily harm." Id. at 751 (internal citation and quotation marks omitted).

Dickinson premises her negligent infliction of emotional distress claim on the following actions by Merrill Lynch representatives:  Klug's treatment of Dickinson on December 12, when Klug yelled at her, interrogated her, and insisted that Dickinson would be responsible for the $225,000 loss, and Klug's instruction to Dickinson on

December 13 to go home and have no contact with her clients.[6]

Most of these actions did not occur in the "termination process."  The Connecticut Supreme Court has held that "investigatory action arising from actual or alleged employee misconduct" is among the "routine employment-related conduct" to which an employee should expect to be subject in the course of an "ongoing employment relationship."  Perodeau, 259 Conn. at 757.  Even if a plaintiff is terminated as a result of findings that result from an investigation, the investigation itself is generally not part of the termination process.  See Day v. Seacorp, Inc., No. 550385, 2002 WL 31050891, at *7 (Aug. 13, 2002) (holding that Perodeau precludes liability for negligent infliction of emotional distress experienced "as a result of disciplinary and investigatory action arising from actual or alleged misconduct"); Gorra v. Seacorp, Inc., No. 550384, 2002 WL 31051041, at *7 (Aug. 13, 2002) (same); Kelly v. Seacorp, Inc., No. 550383, 2002 WL 31050779, at *8 (Aug. 12, 2002) (same); see also Michaud v. Farmington Comm. Ins. Agency, No. CV010806951S, 2002 WL 31415478, at *4 (Sept. 25, 2002) (holding, with respect to a negligent infliction claim, that, "termination means the ending, not the conduct which causes the ending.").  Thus, Klug's manner of interrogating Dickinson and Klug's order that Dickinson go home and avoid contact with clients while the investigation was proceeding were part of the ongoing employment relationship, rather than the termination.

Moreover, even if these actions had been part of the termination process, the

---

[6]At oral argument, the plaintiff's counsel withdrew one additional basis for the negligent infliction of emotional distress claim, which involved a gap between the date on which Merrill Lynch decided to terminate Dickinson and the date on which it informed her of the termination.

court does not find them to be "sufficiently wrongful that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that [that] distress, if it were caused, might result in illness or bodily harm." Perodeau, 29 Conn. at 751 (internal citation and quotation marks omitted).  While the plaintiff has presented evidence that the tone Klug used and the statements she made to Dickinson were very hostile and upsetting, they did not rise to the level that would support a negligent infliction of emotional distress claim.

Therefore, the court grants the defendant's motion for summary judgment with respect to the negligent infliction of emotional distress claim.

### E.    Defamation (Count V)

In Count V, Dickinson alleges that Merrill Lynch published the stated reasons for termination in the Form U-5 "Uniform Termination Notice for Securities Industry Regulation" in reckless disregard for their falsity, thereby harming Dickinson's reputation and effectively making it impossible for her to find a new job as a financial advisor.

The parties dispute whether statements in a Form U-5 are protected by an absolute or qualified privilege.  Absolute privilege attaches to statements made in formal judicial proceedings and "to relevant statements made during administrative proceedings which are 'quasijudicial' in nature."  Kelley v. Bonney, 221 Conn. 549, 555-56 (1992); see Heldmann v. Tate, No. CV 9559122S, 1999 WL 353476 (Conn.Super. May 20, 1999) (quoting Petyan v. Ellis, 200 Conn. 243, 245 (1986)) ("In Connecticut the law is that the class of absolutely privileged communications is narrow, practically limited to legislative and judicial proceedings and acts of state that are quasi-judicial."). "Once it is determined that a proceeding is quasijudicial in nature, the absolute privilege

that is granted to statements made in furtherance of it 'extends to every step of the proceeding until final disposition.'" Id. at 556.

As two judges of the Connecticut Superior Court have held in similar cases, Merrill Lynch's statements on the Form U-5 are protected by a qualified, and not an absolute, privilege.  See Galligan v. Edward D. Jones & Co., No. 389623, 2000 WL 1785041, at *11-*12 (Conn.Super. Nov. 13, 2000); Heldmann, 1999 WL 353476; see also Dawson v. New York Life Ins. Co., 135 F.3d 1158, 1163-64 (holding that reports of customer complaints on Form U-5 are not protected by absolute privilege under Illinois law); Glennon v. Dean Witter Reynolds, Inc., 83 F.3d 132, 136-37 (6th Cir. 1996) (holding that statements on Form U-5 are not entitled to absolute privilege under Tennessee law) ; Baravati v. Josephthal, Lyon & Ross, Inc., 28 F.3d 704, 708 (7th Cir. 1994) (holding that Form U-5 statements listing reasons for termination are not protected by absolute privilege under Illinois law); Fahnestock & Co., Inc. v. Waltman, 935 F.2d 512, 516 (2d Cir. 1991) (upholding arbitration award where arbitrators held that statements on Form U-5 are protected by qualified, but not absolute, privilege under New York Law); Acciardo v. Millenium Securities Corp., 83 F.Supp.2d 413, 419-421 (S.D.N.Y. 2000) (same); but see Culver v. Merrill Lynch & Co., No. 94 CIV. 8124 (LBS), 1995 WL 422203 (S.D.N.Y. July 17, 1995) (holding that statement on Form U-5 was subject to absolute privilege under New York law); Herzfeld & Stern, Inc. v. Beck, 572 N.Y.S.2d 683, 691-92 (1991) (same).   At least in the context of the present case, this court agrees with the reasoning of the courts that have held that, although the NASD does exercise quasi-judicial responsibilities, "the submission of a Form U-5 and its transmission (upon request) to members of the NASD are not stages in the

27

association's quasi-judicial regulatory process."  Galligan, 2000 WL 1785041, at *11

(quoting Acciardo, 83 F.Supp.2d at 419); accord Glennon, 83 F.3d at 137; Baravati, 28

F.3d at 708.   In the instant case, as in Galligan, "there were no pending or impending

quasi-judicial proceedings."[7]  Id. at *12.  Therefore, the court finds no evidence that the

Form U-5 that Merrill Lynch submitted in the instant case was a step in a quasi-judicial

proceeding.

        Moreover, although the public policy of protecting securities investors by

promoting full and truthful disclosure by securities firms does not compel application of

an absolute privilege to a statement that is not a step in a quasi-judicial proceeding, the

Form U-5 statements are protected by a qualified privilege, which protects firms from

defamation suits for any U-5 statement made in good faith, without malice.  See

Galligan, 2000  WL 1785041, at *13; Heldmann, 1999 WL 9559122S, at *2; see also

Dawson, 135 F.3d at 1164; Baravati, 28 F.3d at 708; Fahnestock & Co., 935 F.2d at

516; Acciardo, 83 F.Supp.2d at 419; but see also Culver, 1995 WL 422203, at *5;

Herzfeld & Stern, 572 N.Y.S.2d at 691-92.

        Where, as here, a defendant shows entitlement to a qualified or other conditional

privilege, "it will be presumed that the communication, though defamatory, was made in

good faith and without malice in fact."  Kelly v. City of Meriden, 120 F.Supp.2d 191,

198-99 (D.Conn. 2000) (internal citation omitted) (denying defendant's summary

_____

        [7]In contrast, Kelley, which Merrill Lynch cites as support for its position that the
court should apply an absolute privilege, involved materials that were sent to the state
board of education in order to request an investigation to determine whether the
plaintiff's teaching certificate should be revoked.  221 Conn. at 555, 565.  Pursuant to
state law, the submission of these materials initiated an investigation and hearing
process.  Id. at 567-71.

judgment motion with respect to defamation claim).  The plaintiff bears the burden, at the summary judgment stage, of pointing to evidence that could rebut the presumption of good faith by showing a genuine issue of fact as to whether the statement was made with "malice in fact."  See id.; see also Malik v. Carrier Corp., 202 F.3d 97, 108-09 (2d Cir. 2000) (affirming grant of judgment as a matter of law in the absence of a showing of "malice in fact"); Torosyan v. Boehringer Ingelheim Pharm., Inc., 234 Conn. 1, 28 (1995) (affirming trial court judgment).  That is, a genuine issue of fact must exist as to whether the statement on the Form U-5 was made "with knowledge of its falsity or reckless disregard as to its truth."  Torosyan, 234 Conn. at 29 (citing  Bleich v. Ortiz, 196 Conn. 498, 504 (1985) (affirming trial court judgment); 4 Restatement (Second) of Torts § 600 (1977)); see Kelly, 120 F.Supp.2d at 199; see also Gaudio v. Griffin Health Svcs., 249 Conn. 523, 545 (1999)  (upholding jury verdict where there was evidence that defendants made a false statement "even though they doubted the statement's veracity") (citing Woodcock v. Journal Publishing Co., 230 Conn. 525, 527 (1994); Torosyan, 234 Conn. at 30; Bleich, 196 Conn. at 504).  "Whether the privilege has been lost because of abuse is a question normally for the jury."  Burton v. Am. Lawyer Media, Inc., 83 Conn.App. 134, 139 (2004) (emphasis in original).  However, "a failure to undertake an adequate investigation is not dispositive of the issue of actual malice." Woodcock, 230 Conn. at 545.

Dickinson has come forward with evidence that Kelly reached the conclusions stated on the Form U-5 – that Dickinson had given conflicting information about the wire transfer and that she had failed adequately to service a client's account – largely as a result of Klug's account of Dickinson's statements, attitude, and behavior.  Kelly Dep. at

at 15, 22-23, Plf.'s R. 56(a)2 Appx. [Doc. No. 34-2].  There is no evidence that Kelly

herself acted with knowledge of the falsity of this statement or with reckless disregard

for its truth or falsity.  However, there is evidence that could support an inference that

other agents of Merrill Lynch had knowledge of the actual or potential falsity of the

information on the U-5.  The evidence that Klug refused to listen to Dickinson,

repeatedly screamed at her before hearing her side of the story, and told her, on the

first day of the investigation, that Dickinson "would not be pleased with the outcome of

the investigation,"  Dickinson Dep. at 131-32, Plf.'s R. 56(a)2 Statement [Doc. No. 35-

2], could support a finding that Klug intentionally or recklessly made a false report to

Kelly.  Klug acted as an agent of Merrill Lynch in conducting the initial investigation and

reporting to Kelly that Dickinson had made inconsistent statements.  The court finds

sufficient evidence to impute Klug's knowledge of her statements' actual or possible

falsity to Merrill Lynch, such that the final U-5 statement may have been made with

"actual malice" on the part of Merrill Lynch as a whole.  See Reardon v. Mutual Life Ins.

Co. of N. Y., 138 Conn. 510, 516 (1952) ("When an agent acting within the scope of his

authority obtains knowledge of a fact relevant to the transaction in which he is engaged,

ordinarily that knowledge is imputed to his principal. The knowledge of the agent is the

knowledge of his principal"); cf., e.g., In re Wakefield, 293 B.R. 372, 385-86 (N.D.Tex.

2003) (affirming bankruptcy court holding that imputed corporate officer's knowledge of

falsity of U-5 form to corporate defendant, where officer informally approved statement

on U-5 form, even though compliance officer who completed U-5 form was unaware of

its falsity).  Dickinson has therefore shown a genuine issue of fact as to whether the

statements on the Form U-5 were made with malice.

The court therefore denies the defendant's motion for summary judgment with respect to Count V.

### F.      Breach of Contract (Count VI)

In her Rule 56(a)2 Statement, Dickinson concedes that the contract contained a clause saying that she could be terminated at any time with or without cause, but claims that "the document contains multiple provisions that modify and/or contravene the quoted portion."  Plf.'s R. 56(a)2 Statement at ¶ 2.  In her memorandum in opposition to summary judgment, she discusses the existence of several clauses in her employment contract that would come into effect only if she were terminated for cause or if she resigned.  See Plf.'s Mem. Opp. Mot. Summ. J. at 36-37.  She then argues that, although the contract expressly gave Merrill Lynch the right to terminate Dickinson without cause at any time, the listing of reasons for discharge on the Form U-5 shows that she was terminated for cause.

Dickinson contends that, "Defendant breached the express Contract by invoking the 'for cause' provision and thereby depriving Plaintiff of her right and opportunity to take another broker position and to notify her clients of her new location."  Plf.'s Mem. Opp. Mot. Summ. J. at 38 [Doc. No. 33].  Although she argues that the U-5 form effectively bars her from obtaining a new job as a financial advisor, she does not point to any evidence, nor argue, that Merrill Lynch has actually sought to enforce the provisions of the contract that would prevent the plaintiff from contacting her former clients or other accounts held by Merrill Lynch if she was terminated for cause.  She does not show how Merrill Lynch could be found to have breached the employment contract.  The court therefore grants summary judgment to the defendant on Count VI.

31

### G.      Breach of the Covenant of Good Faith and Fair Dealing (Count VII)

Next, Dickinson alleges that Merrill Lynch breached the covenant of good faith and fair dealing in its conduct towards and termination of Dickinson.  Where a contract is terminable at the will of either party, "a breach of such an implied covenant cannot be predicated simply upon the absence of good cause for a discharge," unless "the reason for his discharge involves impropriety . . . derived from some important violation of public policy."  Magnam v. Anaconda Indus., Inc., 193 Conn. 558, 571-72 (1984) (internal citation and quotation marks omitted).

Dickinson argues that her employment was not really at will, despite the contract provisions stating that it was, because other contract provisions modified this provision.  In Connecticut, employment is considered "at will" unless the parties have contracted otherwise.  Cweklinsky v. Mobil Chemical Co., 267 Conn. 210, 225 (2004). "Employment at will grants both parties the right to terminate the relationship for any reason, or no reason, at any time without fear of legal liability."  Id. (citing Thibodeau v. Design Group One Architects, LLC, 260 Conn. 691, 697-98 (2002)).  In the present case, the employment contract explicitly stated, "NOTHING HEREIN IS A PROMISE OF EMPLOYMENT FOR A FIXED TERM.  MERRILL LYNCH MAY TERMINATE MY EMPLOYMENT FOR ANY REASON OR FOR NO REASON, JUST AS I MAY RESIGN AT ANY TIME."  Def.'s Mem. Supp. Mot. Summ. J., Ex. 1 [Doc. No. 27-6].  Dickinson argues that the contract was not "at will" because it contained liquidated damages provisions that would have penalized her if she had terminated her employment during the first two years after the contract began and non-compete and non-solicitation clauses that come into play only upon termination for cause or her resignation, and

32

which would not attach if she was terminated without cause.  She argues, therefore, that she was not free to terminate the employment relationship "with impunity."  See Campbell v. Town of Plymouth, 74 Conn.App. 67, 74 (2002).

The court finds that, in light of the explicit language quoted above, the contract did not prevent Merrill Lynch from firing Dickinson without cause at any time, even though the negative consequences attached to for-cause termination would require the defendant to adhere to the covenant of good faith and fair dealing in determining whether a termination was for cause.  Therefore, the contract was effectively "at will," for purposes of the holding in Magnam.  The plaintiff invokes no public policy that the termination violated, and she provides no evidence that the termination breached the covenant of good faith and fair dealing other than that it was done without cause.  She does not proffer evidence to show that Merrill Lynch attempted to penalize the plaintiff after her termination in a manner permitted only in connection with terminations for cause.  Magnam precludes the plaintiff's claim for breach of the covenant of good faith and fair dealing, and the court grants summary judgment to the defendant on this count.

### H.    Negligent Investigation (Count IV)

In light of the court's finding that Merrill Lynch retained the right to terminate Dickinson without cause, the defendant had no duty to conduct a fair and impartial investigation into Dickinson's conduct with respect to the fraudulent wire transfer, at least so long as the impropriety in the reason for the termination did not arise from an important violation of public policy.  See Morris v.Hartford Courant Co., 200 Conn. 676, 679-81 (1986).  The plaintiff points to no such violation of public policy.  Therefore, the court grants the defendant's motion for summary judgment with respect to this claim.

33

**V.      CONCLUSION**

For the foregoing reasons, the defendant's motion for summary judgment [**Doc.**

**No. 27**] is GRANTED in part and DENIED in part.  It is granted as to all counts except

for Counts I (Title VII discriminatory discharge), II (CFEPA discriminatory discharge),

and V (Defamation).  The plaintiff's motion to strike the exhibit attached to Felicia Klug's

deposition [**Doc. No. 42**] is GRANTED.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 5th day of May, 2006

/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge